And we will proceed to Blake v. U.S. Attorney General, which is consolidated cases 19-14316, 20-11335, and 21-12334. We'll hear first from Mr. Setzenfant. If I mispronounce that, my apologies, and please correct me. Good morning, Your Honors. This is for Petitioner, and may it please the Court. Although Petitioner's life is at stake in these appeals, he has never had the opportunity to present his case at a hearing under the Convention Against Torture. Petitioner did not have that opportunity in June 2009 when his order of removal was issued because he was not yet in the danger that he now faces, both because he had not yet testified against drug lord Christopher Koch, and because events in Jamaica that further threatened his life had not yet occurred. In these appeals, Petitioner is asking this Court to remand the case back to the Board of Immigration Appeals so that it can more carefully consider his motion to reopen and give him the opportunity for a hearing before an immigration judge. He's asking this because the Board erred in deciding that he had not shown a change in country conditions and had not made out a case for prima facie relief under CAT. And he's asking this because the Board didn't just err once. It erred a second and third time by issuing decisions that merely relied on the first erroneous Board decision and failed to address new material evidence that further demonstrates the threat to Petitioner's life. Now, the first manner in which the Board erred that I'd like to discuss today is by drawing a false dichotomy between changed personal circumstances on the one hand and changed country conditions on the other. This Court squarely held, including in the Jiang case, that changed personal circumstances and changed country conditions can occur in parallel. In that case, a Petitioner, a Chinese national, sought to reopen her case based on the fact that she had had two children, and if she were to be removed to China, she would be subjected to the one-child policy and possibly sterilized. So clearly, the two children that she had, that's a change in personal circumstances that occurred in the United States. And the one-child policy notably existed at the time of her order of removal. But what the Petitioner in that case claimed was that were she to be removed to Fujian province, the one-child policy was being enforced more heavily there at that time. And in fact, officials in that province knew that she had given birth to two children and would enforce it against her. So notwithstanding that there is a clear change in personal circumstances there, the change in country conditions was sufficient to support her reopening in that case. So counsel, your argument is basically that when you've got changed country circumstances that feed off of, or that work in conjunction with, or sort of a dynamic situation with personal circumstances, then that qualifies as changed country conditions, which then allows the BIA to reopen the case. Is that correct? That's precisely correct, Your Honor. Okay. So let me ask you this. The problem that I see is that it looks like possibly BIA, when it looked at this, was not comparing the circumstances in 2009, that is at the time that Koch was still in power, that Golding was still in power, et cetera, to the time of the filings of the three different motions to reopen, each of which has new circumstances. The killings of the family members, I guess the six of them, I guess in one of the opinions, it's described as an attack as opposed to the slaughter of the six family members. And then what happens when he's returned to Jamaica in error and the slaughter of his brother. So my question to you regarding all of that is, how did those things work in conjunction with the are no longer in power in 2019 versus in 2009 when they were? So while Koch and Golding are no longer in power, Koch's in prison, Golding's no longer prime minister, there's declarations in the record that makes clear that the shower posse is still in existence and Koch's son in particular is still head of the shower posse. The evidence from the second motion to reopen where the petitioner, as you noted, your honor, was removed to Jamaica, notwithstanding a court order that prevented that removal and was almost killed within hours really by two men itself shows the power that the shower posse still has in Jamaica and that the threat to the petitioner's life is still real. And importantly, one of the ways in which all three of these board decisions aired was by not finding, was by finding that the evidence was too old. So the first board decision aired by not considering two declarations that were submitted that attested to the fact that the petitioner was still in danger. The second board decision aired because it didn't fully consider the evidence of this unlawful removal of the petitioner to Jamaica in May 2019 where he's almost killed. It suggested in its decision that that evidence was old. I believe that even the government concedes that this is a strange remark in the board decision that this evidence from May 2019 should have been submitted earlier in his February 2019 motion to reopen. But that fact by itself requires a remand. This court has held, including in the Krishnawati case, that where the board states that evidence is not new, when in fact that evidence is new, a remand is required. What happens if we agree with you about the second motion to reopen? There was, it seems to me, speaking for myself, clearly an error there. And we say, hey, they didn't consider this because they thought it was old. That was a mistake. But then they have this third motion to any of the previous ones and they unquestionably do consider that May 30th to June 2nd, 2019 incident. What do we make of that? Is there a way to grant the brief sort of reverse on the second motion to reopen despite the fact that we understand they did take it into consideration in the third? What do you think about that? So I think that you could remand on the second for that reason. But even with respect to the third, I agree that this decision is much longer. But when you review the decision, perhaps at least when I reviewed it, it's mostly procedural history, just describing what happened in the past. There's not much more analysis there. The court doesn't explain why this is a change and solely a change in personal circumstances as opposed to a change in country conditions. And in my view, there's no analysis explaining why that threat to his life in May 2019 doesn't show that those changed country conditions still exist here. So even with respect to this third decision, I submit that there's a lack of reasoned consideration there and the court erred. I was very interested in Professor Harriet's affidavit, I guess you would call it. And I was struck by how often he uses the phrase continues, remains, is still to suggest repeatedly that the conditions that persist today, 2019, I think, 2021, have persisted really since the 70s, but definitely since the 90s when the shower posse was really at its acme and then in the early 2000s. And that's, I think, corroborated to some degree by the fact that Mr. Blake, in fact, first came to the United States by his own testimony because he was afraid he was placed in that torture chamber, they call it the jail, and he was afraid that Coke and the shower posse were going to kill him at that time. So I agree that the personal circumstances are very different, but how have the changed country conditions proven that there's a material difference in the country that's relevant for his purposes? So there's three primary ways that we submit that there's been a change in the country. So I agree, Your Honor, that the shower posse has been in existence for decades and continues to exist. And the petitioner did testify against Christopher Coke, and there's no denying that he is in danger because of that testimony and would have been in danger regardless of what happened in Jamaica. But we submit that the danger to him has materially increased for three reasons. First, the fact that he was attacked in May 2019. Obviously, there is always going to be a risk that that would happen. But the fact that it happened and happened so quickly shows that that risk is a reality and is evidence in itself of an increase in material conditions in Jamaica, making it more likely that he will be killed if he's returned there. Let's say I totally agree with you about that. There is a horrible risk. This is why it's such a difficult case. There is a terrible risk to this man. But what are the changes in the country as opposed to they've always killed snitches in Jamaica? The shower posse is always enforced with terrible violence against people who step out of line in Jamaica. And here's a guy who snitched and stepped out of line. And he may well be tortured and killed as a result of that. Horrible to say, but what's the difference in the country since 2009? So I would submit that the attack on his life shows a change in the country, that a dramatic change in the country isn't required. But getting to your point, there was a dramatic change in the country as a result of the extradition of Christopher Koch in 2010. That started in 2009. 70 people died as a result of the attempt to extradite him. This was an incredibly unpopular extradition and prosecution in the United States, at least from the point of view of Jamaicans who had lost so many people. And so when the petitioner testified against Christopher Koch at his sentencing in New York, he was doing so in that historical context. He wasn't just testifying against Koch. He was testifying against all of these Jamaicans who had just been harmed by their government. And for that reason, in that historical context, it's more likely that if he's returned to Jamaica, he will be found by someone, killed. Because he's not just an enemy of Christopher Koch. He's an enemy of so many more people at this point. We also look at things like the way the Tivoli Gardens area responded, things that they in 2017 and 2018 State Department reports, and the fact that Golding, as a result of his extradition, or allegedly as a result of his extradition of Koch, had to resign. And so he was no longer in charge of the country. Did those kinds of things reflect material changes in the circumstances between 2009 and 2019, 2020, 2021? Yes, Your Honor. Those are all material changes in the country. And recent events show that those changes are still in effect. This wasn't an event that was forgotten. In the next news cycle, this was a gigantic event in Jamaica. I see that my time is up. Unless there's further questions, I'd like to save a few minutes for rebuttal. Thank you, Mr. Setzenfant. And we'll hear next from Mr. Nsenga. Good morning, Your Honors. May it please the Court, Andrew Nsenga on behalf of the Attorney General. The Board did not abuse its discretion and find that Petitioner failed to meet his burden to demonstrate a material change in country conditions. As Judge Altman noted, Professor Harriot's declaration really is indicative. Often when litigants try to show they are likely to be harmed, what they often demonstrate is exactly what Petitioner has, that these conditions have continued. The Shower Posse has long been violent. We know that because along with Professor Harriot's declaration, Mr. Petitioner himself was part of that gang, committed violence for that gang while in the 90s. The violence against snitches is nothing new. Now, Petitioner comes to the Court today and for the first time says, well, someone else in the public might harm him. That's not a claim that's been raised in three motions reopened and six briefs in this Court. If Petitioner claims some other random Jamaican might harm him, he had to raise that claim to the agency. To say that's a change in country conditions ignores the materiality. Yes, there was a dispute in the Tivoli Gardens area, but Petitioner doesn't demonstrate how that's relevant to him. He wasn't involved in that at all because he was in jail in the United States on his various I'm understanding from the argument, maybe I'm misunderstanding, that the idea is that when Coke was extradited and you have these resulting demonstrations that are literally community-wide and you have people dying as a result of them and there are things being shouted about basically how Coke is a savior and comparing them to Jesus Christ and all of these kinds of things, that that reflects a new step, a further exacerbation, if you will, of the conditions for anybody who would be opposed to Coke that did not exist at a time before he was extradited. The resignation of Golding further indicates that and shows that it's actually reached all the way up to the top of the country. Why is that not the case? Because it's not a material change in country conditions. Again, it doesn't demonstrate that someone in Petitioner's position who is an informant or a snitch is more likely than be harmed or that the government is more likely to acquiesce. It's just not a material change relevant to Petitioner. What Petitioner's claim is that Coke himself will be involved in harming him or the Shower Posse. It's not that some random Jamaican is going to be mad about the harm or some sort of, I don't know, her pride. But Council, I mean, it seems like when he's saying that Coke and or the Shower Posse, he's talking about the reach of that organization, right? And the reach of that organization is if people who are in Tivoli Gardens see him, they'll inform on him, and then the Shower Posse will come after them. In other words, it's an entire community convergence, if you will. And that is different from what things were in 2009. I mean, the example that they use is they say, well, when he was sent back there by mistake, you know, within three hours or whatever of his arriving, he's chased down by a man with a machete and a man with a gun, and just barely escapes, has to go to the US Embassy, and has to remain, you know, pretty much undercover until he is hustled out of the country. And it seems to show an immediacy there that may not have been there in 2009. As a result of the fact that Coke has now been extradited, his son is now in charge, Golding is no longer in his position, because it wasn't tenable for him to remain in power once he had extradited Coke. So all of these factors seem, why is that not different? What is it? What is it about that that's exactly the same as it was in 2009? Or at least not, negligibly different? Well, first has to be a material difference. Right, that's exactly what my point is. What is it that's not different in a material way? So what I'm saying is not exactly the same, not negligibly different, but what's not materially different about that? You've got a different regime in power, right? And the reason they're in power, right, is because of the very reason that Mr. Blake does not fear returning to Jamaica, right, because of the extradition of Coke. You've got a different shower posse regime in place as well, because now you've got Coke's son. And you've got the extra aggravation of the community as a result of the extradition. And because after all, Coke is paying for, or the shower posse, I guess, is paying for all kinds of improvements in Tivoli Gardens, and basically acting as a de facto government there. Well, again, Your Honor, because nothing of this is particularly new. And again, Professor, their own declaration shows that this is, these problems have long difficulty of sort of mixing all these facts together. First of all, the sort of more recent alleged attack in Jamaica has nothing to do with Tivoli Gardens. We don't really know who was involved in any of that. What we know is that's reflective of an ongoing country condition. And this court has already noted that in a published decision in denying the state of removal, that these conditions for informants have not, has not gotten worse. The, in fact, what's curious about the claim now is it's almost suggesting that somehow it's gotten worse now that the U.S. government has managed to convict people like Petitioner and Coke. But instead, the problem is violent gangs, unfortunately, in some countries, have often been recognized as some sort of Robin Hood entity. None of this is new, whether in Jamaica or any country. Pablo Escobar in Jamaica, Petitioner had testified in 2000, 1990, 1985, or according to Professor Harriet's declaration in the late 70s. Unfortunately, these shower posse people are dangerous. We know that from Coke's actions. We know that from Petitioner's convictions prior to any of these 2009 events. These are violent. I'm sorry, Mr. Insegno. What do we say about the mistakes, the obvious mistakes in the second and the third BIA order? Because Mr. Setzenfant, I hope I got that right, his claim isn't just you should reverse the decision not to reopen. His claim is also a somewhat more technical one that we, I think, unquestionably review on mistakes here in the reasoning and the factual basis that merit in and of themselves a reversal and a remand. What do you make of those mistakes? They're there, right? Yes, the third one certainly is there. I'll start with there. In general, these are just harmless errors. Unfortunately, sometimes, or to an agency, you make minor factual errors. For example, the District of New Jersey denying or granting a habeas decision said that a petition for review had to be filed in the Second Circuit. Yet here we are in the Eleventh Circuit. The District Court also said the petitioner wasn't even alleging a change in country conditions because he was simply based on his testimony in the United States. Yet here we are talking about changing country conditions. Those errors don't make the suspension clause analysis necessarily wrong. Unfortunately, errors do exist. Well, at least with the second one, it could be dispositive. The third one, I guess you have a point. They wrongly construed the prior panel's decision on the motion to stay. For the second one, they said that what Mr. Setsenfant is saying is a critical piece of evidence happened before he filed his motion before the IJ rather than obviously very clearly after. That seems to be a dispositive question, doesn't it? No, Your Honor, because of the third petition for review. Now, I think, first of all, for the issue in the second, I believe, and this is trying to understand what the situation was, petitioner's second motion to reopen was essentially two paragraphs long. And what it said was it blamed petitioner's first counsel for not filing those documents while the appeal of the board was pending. DHS responded saying that the evidence should have been filed before the board. So it looks as when the board is saying it was filed with the immigration judge. I agree. It looks like what it meant was should have been filed in the sort of inter-appeal period. So regardless of my attempt to understand the situation, it's unclear, undeniably. But what we have then is, and potentially maybe that would require remand for a greater explanation. But the board's third decision explains the situation. It considers all this evidence, just as much as this court in this published decision in this case said that the first decision was adequate. It gave reasoned consideration. The third decision, as Your Honor points out, is much longer, carries greater consideration. Petitioner even attempts to avoid the consequence of that published board decision by arguing in the third petition's reply brief that the first decision is outdated. They actually make that argument. Well, and there's a degree to where the government would agree that when you file these motions and there's new briefs and new decisions, that we have to look at later decisions to have a greater understanding. So sort of the question is, if this court were to send the second decision back, well, it would likely look like the third decision. The agency considered the evidence and found that the later events simply are reflective of ongoing dangers to snitches or informants, which is demonstrated by Petitioner's own evidence. So the board's decision was more than adequate. Again, this court was able to discern it and understand everything, as the board said, in denying the stay of removal in a published decision. If this court could understand the first decision, certainly understands now the second and third decisions. Unless your honors have any further questions, we'd ask the court tonight. Yeah, Mr. Insanga, I wanted to go back to one of Judge Rosenbaum's questions where she was asking you about the materiality of changed country conditions. The incidents that are in evidence in the record, such as Mr. Blake's relatives being murdered, his sister's house being burned down, his girlfriend's house bombed, those are things that happened to him and his family, and in that sense, they're personal. But why can't they be, why aren't they evidence of material country conditions having changed? Because they're reflective of ongoing conditions. Again, these things have long happened. It's unfortunate, and the government recognizes that this is unfortunate, and in a lot of ways, an unsatisfying case, understandably. But those things, again, there's no reason they wouldn't have happened in 1990 when Petitioner was a member of this gang, and this gang was violently opposing snitches. Those conditions in Jamaica, it's the same thing as it is today. So yes, you have to consider personal change with the concept of changed country conditions. One of the concerns behind the policy of not considering personal circumstances is that they're within the control of the Petitioner. But here, these things that happened to his family in Jamaica were not under his control, so we don't have that concern here, right? No, Your Honor, but policy arguments don't trump the plain language of the statute. It's the thing that being beyond the person's control, that is certainly an aspect of the concept of sometimes it's brought up of gaming the system. But people, for example, with the Coercive Population Control Program, people in the United States are allowed to have children. It's not inherently gaming the system, but even if they're absolutely not gaming the system, that doesn't mean that that personal circumstance constitutes a change in country condition. So policy arguments don't trump the plain language of the statute and the voodoo and doherty and decades of precedent. So we'd ask that the court deny the petition. Thank you, counsel. Mr. Setzenfant. Thanks, Your Honor. Briefly, I have three points I'd like to make. It might turn out to be four, but I'm going to try to keep it to three. So starting with the plain language of the statute that Mr. Nsenga mentions, I'd like to flag that the plain language says, changed circumstances arising in the country of removal. It doesn't require a dramatic change, a broad change that affects the whole country. We submit that that occurred here, but that's not required. The decisions from other circuits that we've cited in our briefs, including the Longar decision and Joseph decision, make clear that where there's an event that occurred in the country of removal that was outside of the control of the petitioner, that is a change in circumstances. So while there's no dispute here, his testimony in New York, that was a changed personal circumstance in New York. Everything that occurred in Jamaica, though, those are changed circumstances arising in the country of removal. Second point I'd like to make is that at the beginning of Mr. Nsenga's presentation, he referenced how there's a... Could I ask you, Mr. Setzenfant, is it your position, I'm sorry to interrupt, is it your position then that the situation for informants like Mr. Blake is worse now than it was in 2005, 2009? And if so, what do you make of his own testimony that he fled three times between 2003, I think in 2009, precisely because he was afraid that the shower posse was going to put him in the torture chamber where he had seen other people murdered and but it wasn't in the same sort of risk that he's in now, given his testimony against Christopher Kochan, given the historical context in which that testimony occurred. It didn't occur in a vacuum. It occurred in the aftermath of a botched extradition that killed over 70, it resulted in the deaths of over 70 people. I think Judge Rosenbaum used the phrase entire community convergence, which is certainly more eloquent than anything I'd come up with in the brief. But that's what occurred here. And what would occur if he's removed to Jamaica is, it's not just the shower posse itself that will try to kill him, it's people will see him and alert affiliates of Koch. And perhaps that's what occurred when he was removed to Jamaica in May 2019. And it was almost killed so quickly within hours of removing him. The US embassy in Kingston had a scramble to get him back to the United States after that. And it's just a matter of luck that he was able to escape there. So the threat to his life now is far greater than it was in the past. And far greater than it would have been had it not occurred in that historical context. One other point I'd like to make about Mr. Ntsenga's presentation is just the point about factual errors. The second board decision is certainly a major error, especially when that decision is so short. It does appear to just rely on the fact that this evidence is old when it's plainly new. At the very least, we don't know what's happening with the decision and it should be remanded. And the third board decision similarly, just relies on the earlier two decisions. So I see that my time is running out. I just want to end by saying that for all the reasons discussed today and in the brief, I'm asking this court to grant the petition for review, vacate the board's decision, remand the case back to the board with instructions that the petitioners met the legal requirements for reopening. Thank you. Thank you both. We appreciate your arguments and we will be in recess until tomorrow. Have a great day.